1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3       * * * * * * * * * * * * * *
       *UNITED STATES OF AMERICA    *
4                                   *    CRIMINAL ACTION
                   v.               *    No. 11-10217-RGS-2
5       *                           *
       RONALD MERRITT               *
6       * * * * * * * * * * * * * *

7

8

9            BEFORE THE HONORABLE RICHARD G. STEARNS
                 UNITED STATES DISTRICT JUDGE
10                    SENTENCING HEARING
                     September 7, 2012
11

12      APPEARANCES:

13            UNITED STATES ATTORNEY'S OFFICE, (By AUSA John A.
       Wortmann, Jr.) 1 Courthouse Way, Suite 9000,  Boston,
14      Massachusetts  02210, on behalf of the United States of
       America
15

16            SINSHEIMER & ASSOCIATES, (By Robert S. Sinsheimer,
       Esq.) 92 State Street, 9th Floor, Boston, Massachusetts
17      02109, on behalf of Ronald Merritt

18

19

20
                                    Courtroom No. 21
21                                  1 Courthouse Way
                                    Boston, Massachusetts 02210
22

23                     James P. Gibbons, RPR, RMR
                          Official Court Reporter
24                    1 Courthouse Way, Suite 7205
                       Boston, Massachusetts  02210
25                        jmsgibbons@yahoo.com

```
1                    P R O C E E D I N G S
2           THE CLERK:  All rise for this Honorable Court.
3      Court is open.  You may be seated.
4      The Court calls Criminal Action No. 11-10217, United
5  States of America versus Ronald Merritt.
6      Counsel, please identify yourself for the record.
7           MR. WORTMANN:  Your Honor, good afternoon.  John
8  Wortmann for the United States.
9           MR. SINSHEIMER:  Good afternoon, your Honor.
10  Robert Sinsheimer for Mr. Merritt.
11           THE COURT:  All right.
12      I, as have all counsel, and I assume Mr. Merritt, have
13  reviewed the presentence report.  I have the sentencing
14  memorandum the government has filed, a lengthy sentencing
15  memorandum, with a number of attachments to it, which I have
16  reviewed, filed on behalf of Mr. Merritt.
17      Then there has been an exchange among counsel, and
18  ultimately a reservation of the rights on defendant's behalf
19  with respect to the Jamaica Plain crime laboratory, which I
20  think none of us are in much of a position to assess what
21  the impact is.
22      I have read the same material that you -- actually,
23  some of the articles that I think, Mr. Sinsheimer, you've
24  submitted or a least the newspaper-level account of what was
25  happening at the lab.
```

 1      I have no idea what this analyst was doing and what the

 2   legal implications of it would be.  I mean, I suppose this

 3   is a little bit different than the Melendez-Diaz problem,

 4   which is a constitutional issue.  I don't think this is as

 5   much a constitutional issue as the quality of what the error

 6   or crime of commission, if it was, is.  Were weights being

 7   fabricated?  Were chains of custody merely being improperly

 8   vouched for?

 9      I just have no idea from the information.

10      Perhaps you know more, Mr. Wortmann.

11      MR. WORTMANN:  Your Honor, I wish I could tell you

12   that I did.

13      What I know is that there were some -- that the thing

14   got started when there were some -- there were protocols

15   regarding documentation that weren't being followed by this

16   particular chemist who, as far as I am aware of at this

17   moment, is at the center of all this.  Her name is

18   Ms. Dookhan, and she was -- appears to have been, based on

19   the order on which the chemist signs certifications in this

20   case, appears to have been the primary chemist in this case.

21      So it started with that she was doing things -- she was

22   doing testing that was not in conformity with the protocols

23   regarding chain of custody issues.

24      And I hear rumors that it may involve a lot more than

25   that, but the problem is I don't know.  I don't know whether

1   it's ultimately going to rise to the level of exhibits

2   being, in fact, sabotaged; and, if it does rise to that

3   level, how many are going to be involved and whether or not

4   it's going to be able to -- the system is going to be able

5   to differentiate those that were and those that weren't.

6        What I do know in this case is that the lab tends to

7   and, in fact, tests very few of the drug samples.  In this

8   case there were, for example -- I think there were 30 bags

9   that were recovered from the transport vehicle with

10  Mr. Wilkins, and only a couple of those would be tested.  So

11  the rest would be in the bags that they were originally in.

12       Now, in this case the bags that were sold to the

13  undercover by Mr. Wilkins and Mr. Merritt, that was tested.

14       The bag that Mr. Merritt had in his possession was

15  tested.

16       But I just -- as soon as we know anything more, we'll

17  obviously -- you know, I sent Mr. Sinsheimer an email on

18  Sunday when I realized, as I was starting to prepare for my

19  week, that Ms. Dookhan was involved in this case.

20       So I think we all share a common interest in getting to

21  the bottom of it, finding out how many cases are going to be

22  impacted, both from a standpoint of, you know, Is there any

23  effect, and, ultimately, Is there a substantive effect which

24  is going to have ramifications in terms of convictions?  But

25  we don't know.

1          THE COURT:  I mean, a range of issues could be

2     raised.

3          In a trafficking context, weight, of course, would be

4     important because that would drive the sentence.  This is

5     not a trafficking case, so that wouldn't be relevant here.

6          If the analyst were saying something, say, is cocaine

7     when it's not, it would depend on the circumstances in which

8     the sale occurred; because, as I remember, representing a

9     substance to be a controlled substance, even if it's known

10    to be counterfeit to the person making the sale, is not a

11    defense to distribution.  So, again, that would depend on

12    what was said or represented or could be inferred from what

13    happened at the time.

14          MR. WORTMANN:  Correct.

15          THE COURT:  If it's a chain of custody issue, I

16    think it would depend how egregious --

17          MR. WORTMANN:  My office has made a commitment,

18    and, you know, I've been talking to Mr. Sinsheimer, and I've

19    made a commitment that, as we get information, we will

20    disseminate it, and we'll try to figure out a way to hash it

21    out.  But I think that's as much as can be said right now.

22          THE COURT:  Mr. Sinsheimer, I see you've taken a

23    very measured view in your memorandum.  I am pretty much

24    going to have to defer to you.  I don't know how quickly one

25    is going to know what the background of the investigation in

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    Jamaica Plain is.  I am happy to defer the sentence, but I
 2    think a release pending sentencing is not realistic under
 3    the circumstances.  But, again, it's, I think, more your
 4    call at this point, because none of us --
 5        It may be that the reservation of rights with respect
 6    to your client is sufficient -- it would be in my mind -- to
 7    protect his interests, but I cannot guarantee that there is
 8    going to be an answer tomorrow or next week.
 9            MR. SINSHEIMER:  Right.
10        And as I understand the reservation of rights, as
11    Mr. Wortmann has agreed to it -- and I'm not putting words
12    in his mouth, if I'm mistaken, I'm sure he'll correct me --
13    but we've had discussions.  We've tried to do this in as
14    good faith as could be possible given how little we know.
15        I mean, we start at the same place the Court starts.
16    We really don't know much.
17        My understanding is that Mr. Merritt, regardless of
18    what happens today, Mr. Merritt will have as much right
19    tomorrow as he would have had when Mr. Wortmann sent me an
20    email on Sunday -- which I read up in Vermont with the Globe
21    in front of me and the same minimal report that he had --
22    and that it's completely in our discretion if we want to
23    come in and move to vacate and move for a new trial at any
24    time.
25        And I would just leave it at that, because I think
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    that's as full and fair a reservation of rights as I could

 2    be entitled to.  I can't have more.  He already pled guilty.

 3    We know that.

 4        Obviously, I wouldn't be here today asking for him to

 5    be sentenced if it hadn't already been a plea.

 6            THE COURT:  No, I'm aware of that.

 7            MR. SINSHEIMER:  I know.  I mean, but we're, you

 8    know, four days or five days from sentencing.

 9        I understood clearly what you said a moment ago about

10    release pending further discovery, if you want to call it

11    that, is perhaps not a likely option.

12        And having heard that from the Court, I, nonetheless,

13    want to express how important it is from my client's

14    perspective to, nonetheless, try to persuade you to let him

15    out of the whole case today.  We're very, very serious about

16    that, no matter how unlikely it might appear.

17        But I'm not going to segue into that argument yet,

18    because I'm trying to address your immediate concern.  I

19    only mention it to emphasize a factor in the decision

20    making.  He has a right to go forward today, no matter how

21    unlikely it is that anyone is going to let him out today,

22    whether it be your Honor or -- whatever has been expressed.

23    He has a right today --

24            THE COURT:  Or ultimately the Appeals Court.

25            MR. SINSHEIMER:  Right, or ultimately the Appeals
```

1   Court, and that's a right he wants to pursue.

2       And so I don't really think I had a choice.  Once the

3   government agreed to reserve his rights, that makes it easy,

4   from my perspective.  He wants to pursue his right to seek

5   release today, and he wants to reserve his right to attack

6   the conviction, if it turns out there's a reason to do that.

7   And there probably is a reason to do that.

8       I mean, I don't want to sandbag anybody.  There is

9   likely going to be further litigation about this, but I'm

10  not certain, and I want to wait until I see what the

11  government -- meaning in this case the United States -- is

12  going to come up with.  And I think that's the best way to

13  proceed, and that's what I recommend; and, other than having

14  expanded on my memo, I think I'm really in the same place as

15  I was when I filed.

16          THE COURT:  And from what you have said you have

17  discussed this fully with Mr. Merritt?

18          MR. SINSHEIMER:  Absolutely.

19          MR. WORTMANN:  Your Honor, if I could.

20      I think if Mr. Sinsheimer came in today and was seeking

21  relief, he would be seeking relief in the form of a motion

22  to vacate the guilty plea.  And the standards applicable to

23  that are obviously different than the standards on a 2255.

24  And what we've discussed, and what I think is appropriate,

25  is that if, after the judgment, he comes forward and says, I

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    want relief, that that's the standard that the Court really

 2    ought to apply, not the more rigorous standard under 2255,

 3    but, rather, is there basis, is there a good cause, to

 4    believe that the guilty plea should be vacated.

 5              THE COURT:  No.  Ultimately we want justice to be

 6    done.

 7              MR. WORTMANN:  Right.

 8              THE COURT:  I think that's in everybody's interest.

 9              MR. WORTMANN:  Exactly.

10              MR. SINSHEIMER:  And the reason I wasn't using such

11    technical language is precisely because whatever rights

12    there might be as of before sentencing, that's what we're

13    entitled to, and I think it's been very clear.

14              THE COURT:  Okay.

15         Mr. Wortmann, let's proceeds then.

16              MR. SINSHEIMER:  Can I just ask for the record, you

17    are, in fact, reserving his rights?  I would like to hear

18    that from the bench.

19              THE COURT:  Yes.  I think I already said that once

20    before.

21              MR. SINSHEIMER:  Oh, sorry.

22              THE COURT:  And I think when I endorsed the motion

23    I said that I would agree with your proposal in that

24    respect.  So the answer is "Yes."

25              MR. SINSHEIMER:  Thank you.
```

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. WORTMANN:  Your Honor, thank you.

2       I think I'm going to do things a little bit backwards

3   today, because what I want to talk about at the outset is

4   the mitigators that were identified both in my sentencing

5   memorandum and Mr. Sinsheimer's sentencing memorandum

6   obviously in much greater detail.

7       And they're important starting places, just as the

8   starting place for the Guidelines that we could have been

9   starting at, of 188 months, had we filed the 851 and had we

10  required Mr. Merritt to plead to the 860 count, and what are

11  they?

12      Well, this case involved a small amount of drugs.  I

13  freely acknowledge that.  I recognize it.  While that may or

14  may not have been a factor on a career offender case

15  pre-Booker, it is certainly something that you can take into

16  account afterwards, and it's something I took into account

17  in making the recommendation.

18      Mr. Merritt's role in the offense relative to that of

19  Mr. Wilkins, again, a factor that's completely unaccountable

20  for in the Guideline computations because the only

21  adjustment a career offender is entitled to is the

22  adjustment for acceptance of responsibility, which certainly

23  Mr. Merritt is entitled to here.  But, again, your Honor, it

24  sort of wraps up into the nature of the offense of

25  conviction.  And I took that into account because he was

PDF created with pdfFactory trial version www.pdffactory.com

1    meddling a deal.  There was lesser involvement, and

2    Mr. Wilkins certainly had more drugs, a lot more drugs, on

3    him.  But, you know, the undercover officer wanted 8 grams.

4         Third, his age, and I'm cognizant of the research that

5    Mr. Sinsheimer cited to you.  I was cognizant of it at the

6    time.  And 51 years old is certainly a time at which the

7    social scientists tell us that offenders are way past their

8    peak offending.  But, your Honor, not this time.

9    Mr. Merritt -- this will be his eighth conviction since the

10   age of 40.  And at the time that he committed the offense

11   here, he was on parole in one case that he had been violated

12   on, and had spend two years in custody, and he was on

13   pretrial release in another case.  And, unfortunately, when

14   you look at the PSR, he hasn't slowed down.

15        And the need to avoid unwarranted disparities --

16   another concern of the government in every case.  And, in

17   fact, one of the things that really drove my recommendation

18   here, but it wasn't to the disparities -- the supposed

19   disparities in the 27 cases that Mr. Sinsheimer cited to

20   you.  I was the prosecutor in 21 of those cases, and I was

21   involved in the investigation on all 27, and what I can tell

22   you, your Honor, is that of the nine career-offender cases

23   that's included in that batch, the average sentence is 100

24   months, four months more than I'm asking you to impose on

25   Mr. Merritt here.

PDF created with pdfFactory trial version www.pdffactory.com

1    So the simple fact of the matter is that all legitimate

2    mitigating factors and all factors that were carefully

3    considered by me and by the U.S. Attorney's Office in,

4    first, allowing Mr. Merritt to plead down from 188 to 151,

5    and then moving from 151 to 96.

6    So what's left in this case?

7    And what's left is the 800-pound gorilla in the room,

8    which is Mr. Merritt's criminal record; and it was the thing

9    I focused on in the sentencing memo, the thing that drives

10   the sentence, both under the Guidelines and any other way

11   that you're going to look at the case.  Sixteen convictions,

12   13 separate periods of incarceration, 25 years of almost

13   continuous criminal justice supervision, and continuing

14   right up to the day that he sold the drugs to the undercover

15   officer.  Again, he was on parole and pretrial release,

16   crimes of violence, probation violations.

17   And Mr. Merritt for -- and if we only knew and we could

18   only say the reason was just a constant offender and

19   constantly engaging in the same type of conduct over and

20   over again.

21   So the only thing that can be left said is a theme that

22   I hear from time to time is that a lot of his more recent

23   cases, but not all of them, but a lot of his more recent

24   cases were related to domestic violence, and that those

25   cases are somehow less serious.

1        And, your Honor, I start by saying that only people who

2   have not experienced domestic violence firsthand are in a

3   position to say that, because the damage that it inflicts on

4   spouses, on families, and on children, you know, just

5   couldn't be clearer.  But what's even clearer here is the

6   specifics of Mr. Merritt's abuse of women, and the facts of

7   some of those cases, which really deserve careful

8   consideration by the Court because they show that these

9   cases really are serious, and they really have done damage

10  to people, and it really is a serious record.  And a

11  96-month sentence is ultimately something that I consider to

12  be a lenient recommendation, and I made it principally

13  because I found Mr. Wilkins and Mr. Merritt, at the end of

14  the day, looking at the totality of the two of them, to be

15  indistinguishable, and I couldn't justify in my own mind a

16  higher sentence.

17       But let's look at just a couple of them, and I am

18  reading, first, from Paragraph 48, and these are all

19  unobjected to Descriptions of the Offenses, and that's in

20  1994 when Mr. Merritt was 33 years old.

21       "On November 22, 1994, Robin LeShore reported that her

22  boyfriend, the defendant, whom she had an active restraining

23  order against" -- a theme that's repeated over and over and

24  over again -- "had telephoned or had made statements that he

25  was going to kill her.  He arrived at the apartment, kicked

PDF created with pdfFactory trial version www.pdffactory.com

1    in the door, entered the home and pushed her to the floor.

2    He proceeded to repeatedly punch her in the head and kick

3    her."

4        The next one, Paragraph 53, 2002, Age 40.  "On April

5    13, 2002, the victim, Nadeera Codero, informed officers that

6    the defendant had come to her apartment insisting that she

7    attend a funeral with him.  When she refused, the defendant

8    became angry and demanded that she return jewelry and a

9    computer he had given her.  He then grabbed her by the arm,

10   pushed her against the wall and grabbed her throat.  He

11   pulled out a small knife and threatened to kill her.  As the

12   victim struggled to get away from the defendant, she was cut

13   on her right arm.  He fled from the apartment and returned

14   banging on the door while threatening to harm the victim and

15   her daughter.  The defendant was able to push the door, but

16   fled when he learned the victim had called 911."

17       Five months later, same victim, she "informed officers

18   that she and her boyfriend, the defendant, got into an

19   argument while riding in a truck.  She attempted to exit the

20   vehicle because the defendant was being verbally abusive to

21   her.  The defendant pulled her by the hair, grabbed her, and

22   pushed her repeatedly until she fell out of the vehicle.

23   She tried to defend herself by biting the defendant."

24       Lastly, 2008, Age 47, and this is on an offense of

25   intimidation of a witness, a violation of an Abuse

PDF created with pdfFactory trial version www.pdffactory.com

1    Prevention Order, that, "Nadeera Merritt informed police

2    officers that she had been receiving harassing and

3    threatening phone calls from the defendant, her estranged

4    husband, whom she had an active restraining order against.

5    She stated that the defendant was intimidating her and

6    threatening physical harm to her if she did not remove this

7    restraining order.  During her conversation with police

8    officers, the defendant called her cellular telephone five

9    times."

10        And, your Honor, you know, if there was a magic button

11   that I could push and help Mr. Merritt to deal with his

12   temper and to deal with the abuse that he has imposed on

13   others in his life, I would do it.  The simple fact is I

14   don't know what that button is.

15        What I do know is that everything the criminal justice

16   system has tried to do with him has been an abject failure

17   with respect to his repeated abuse of those around him, you

18   know, the threats, the physical abuse.  And this is a really

19   serious record, and it's a record that's -- here's a man who

20   has been in court literally dozens and dozens of times, who

21   has been to, you know, every prison at every level, has had

22   sentences of 3 to 7 years, has spent 10 to 15 years of his

23   life in prison.  And, again, he gets out -- he's two weeks

24   out of a halfway house, he's already on pretrial release for

25   one case, he's still on parole -- and he's selling drugs.

PDF created with pdfFactory trial version www.pdffactory.com

1        Your Honor, this is a case that calls out -- the 96

2    months is a very reasonable, very appropriate sentence, and

3    I ask your Honor to impose it for all those reasons.

4        I ask your Honor also to impose five years of

5    supervised release.

6        I ask that we get Mr. Merritt every possible help that

7    we can get with respect to anger management, with respect to

8    batterers' classes.  I'll join in a recommendation for the

9    500-Hour Drug Treatment Program.  Unfortunately, Mr. Merritt

10   has demonstrated that he is not going -- he hasn't finished

11   yet, and he needs to be incarcerated for a substantial

12   period of time both for his protection and for the

13   protection of the people around him.

14        THE COURT:  Thank you, Mr. Wortmann.

15   Mr. Sinsheimer.

16        MR. SINSHEIMER:  Thank you, your Honor.

17   Your Honor, before I start talking, would you be kind

18   enough to review Paragraph 127 of the presentence report,

19   please.

20        THE COURT:  127?

21        MR. SINSHEIMER:  The last paragraph on page 32.

22   (Pause in proceedings.)

23        THE COURT:  Yes.

24        MR. SINSHEIMER:  And notice that by February 2001

25   the defendant was on track to secure custody of his

1    children.

2        Despite everything that my brother said about the

3    history of alleged, and sometimes admitted, domestic

4    violence, I want to make sure, your Honor, if you will allow

5    a personal digression, that you know that no one takes

6    domestic violence more seriously than I do.  And I am proud

7    that there is a decision, Commonwealth v. Atkinson, in 2011

8    from the Massachusetts Appeals Court where we protected the

9    rights of battered women in the criminal justice system.

10   It's one of my best days in 30 years at the bar.

11       Forgive a personal digression.  The reason for it is so

12   that if I accidently denigrate the importance of domestic

13   violence in order to get us out of here by three o'clock,

14   that's not intentional.  We will never forget that that is,

15   in fact, a serious matter.

16       It doesn't change the key question.  My brother's right

17   that there's an 800-pound gorilla in the room, but the

18   question is:  Is that gorilla really the appropriate thing

19   to be looking at in federal sentencing of an individual

20   after Booker?  If you look at the whole person, you're not

21   discounting domestic violence to give him another chance.

22   You're, in fact, protecting him and society and doing the

23   right thing by his children.

24       Now, there are actually four reasons why the sentence

25   should be far, far, far below the Guidelines, but why

1    anything above what we say, time served but a couple of

2    years, is truly unreasonable on a human -- as a matter of

3    humanity, I suggest.

4        Here they are:  Number One -- and I'm not talking

5    about technical guidelines, your honor.  I'm just talking

6    about the humanity.

7        Number One is the de minimis nature of the offense

8    itself.  That's conceded.  I'm talking about this offense.

9        Number Two is his age, and the age is conceded in the

10   sense that Mr. Wortmann acknowledges it's an important

11   factor in considering recidivism.  I don't think he gives it

12   the full weight, and I'll come back to that.  I'm just

13   listing the factors.

14       One, de minimis nature; two, age.

15       Three, and Mr. Wortmann hardly mentioned this at all,

16   Mr. Merritt is an active father of two young children who

17   still have a chance to grow up with a father who cares about

18   them and loves them, who a court would allow him to remain

19   in custody of, and he -- and whose lives are now being

20   protected by his, Mr. Merritt's, sister.

21       And I want to make clear about that, because the

22   paragraph I asked you to look, which is, "Given his

23   detention, given that his wife's whereabouts are unknown,

24   the children were placed in their aunt's custody."  Their

25   aunt is his sister, who lives in his home.  And that's

1    stated elsewhere in the presentence report.

2         And, finally, another matter that Mr. Wortmann didn't

3    even mention at all, and that is -- and I don't think he --

4    if I'm mistaken, fine, but I don't think he even mentioned

5    it, that is Mr. Merritt's propensity to always seek gainful

6    employment.

7         And I would ask your Honor briefly to take a quick look

8    at Paragraph 155 on the bottom of page 35.

9         (Pause in proceedings.)

10        THE COURT:  Well, I've read 155 but also 156, which

11   is just as important.

12        MR. SINSHEIMER:  Even more so, and you're

13   absolutely right.

14        Mr. Merritt has made an enormous number of mistakes in

15   his life, and he clearly needs better education with respect

16   to the issue of domestic violence.  I fully support the

17   government's recommendation that whenever he gets out he be

18   involved in programs.  We had talked about the CARE and

19   RESTART programs, but there might be better programs.

20        The other thing, your Honor -- I mean, I'm not going to

21   repeat all the material that we sent to you.  But the other

22   thing is if you look at how well he's done while he's been

23   incarcerated already -- that's our Exhibit A -- it's very,

24   very clear that he's tried really hard while he has been in

25   jail.

PDF created with pdfFactory trial version www.pdffactory.com

1        So you take those four factors.  I think when you look

2   at them all together, the way to really sentence Mr. Merritt

3   is to ask yourself this question:  If I were not sentencing

4   him on the domestic violence, what kind of sentence would he

5   really have?  And then see if, despite that, you could find

6   it in your heart to give him one more chance in the hope

7   that perhaps he would not be a batterer anymore.

8        And I think the answer to the first part is easy.  No

9   one really would want substantial incarceration more than

10  he's already served for the de minimis nature of this

11  offense.  And I don't think Mr. Wortmann would.

12       So we really have to look at how a certain kind of

13  activity should be dealt with by a justice in the federal

14  system when the choice is to take a father, who wants to

15  work, away from his children.  And what I say, your Honor,

16  is the way in which our society combats the cycle of

17  violence is to have dads who are good role models living in

18  parts of our world where their may be less fathers.

19       Mr. Merritt is proud, as you pointed out in 156, that

20  he has a father who's taught him to work hard.  He may have

21  also had a father that taught him the virtues of tough love.

22  Maybe in 2012 tough love isn't the right way to proceed in

23  life, and there needs to be better education about that

24  issue.

25       Again, that's not an issue that the federal system is

PDF created with pdfFactory trial version www.pdffactory.com

1   best equipped to deal with.  That's an issue that should be

2   dealt with at the street level and at the state level and by

3   the Massachusetts Probate Court, which has already awarded

4   him custody of his children.

5        And I am being careful not to denigrate Mrs. Merritt,

6   but there's a reason for that, and it's in the presentence

7   report.  She is not an able mom.  So the chance for these

8   people to have a role model, these young children, Mike and

9   Victoria, the chance is if your Honor can find it in your

10  heart to say, Despite this issue that's been out there, this

11  man, at this age, deserves a chance to be a dad because he

12  is a hard worker, because every other aspect of his life

13  shows that society would be better off giving him a chance

14  to be a father, letting him get domestic violence treatment.

15       By the way, he's not in the home now.  So at least if

16  you were to let him out today he would be living in the home

17  with his sister.  He would be living in a situation where he

18  has a chance to rebuild a life.

19       The reality is, as far from the Guidelines as it might

20  seem, if your Honor let him out today, he would go back,

21  live in his parents' home where his sister is serving as a

22  surrogate mom, go out and earn money, and be able to support

23  the children and show them that a man, even at the age of

24  51, gets up the morning, goes to work, brings home the

25  bacon -- if you'll pardon the age-old cliche -- and accepts

1    responsibility.

2         He would also have to accept responsibility for his

3    mistakes and participate in the battered-women or

4    anger-management kinds of programs.

5         Your Honor, we submitted a lot of materials, so I won't

6    belabor it, but I am happy to answer any questions.

7         As odd as it may seem, I do push hard, your Honor, to

8    give him a chance to go back into the community.

9         If you lock him up for eight years, like they're asking

10   for, he's going to be almost 60, and his kids are going to

11   be college age.  And if you put him out there now, he has

12   the chance to do the right thing.  They have a chance to

13   have a dad, and I really don't see how society is harmed.

14        THE COURT:  The material that you submitted I'm

15   familiar with.  What is surprising in Mr. Merritt's case is

16   that he still is involved with crime at his age.  Generally,

17   studies show that by the late 20s, most people who are going

18   to find another life do so at that point.  Often it's

19   because of marriage or sometimes, I suppose, the thrill is

20   lost of taking the kind of risk that crime entails.  But I

21   did find the material, even though it was not new to me --

22   some of it was in the specifics, but the general thrust of

23   the material I'm familiar with and have been for a long

24   time.  It's one of the things that always has puzzled not

25   just judges but, I think, criminologists in trying to

PDF created with pdfFactory trial version www.pdffactory.com

1    understand what drives people into crime.

2        Mr. Merritt, a lot has been said about you, but this is

3    your opportunity to speak for yourself if you wish.  You're

4    not, obviously, required to, but you have a right to.

5            THE DEFENDANT:  I will try.

6            THE COURT:  Okay.

7            THE DEFENDANT:  I understand I have a very bad

8    criminal record, and a lot of it has to do with family

9    issues.  Every time I get out, I do try my best to do the

10   right thing.  This time I relapsed using drugs.  I got

11   involved with a terrible thing.

12       I was on my way to getting my children back, and there

13   was a lot of pressure on me while I was released, as far as

14   going to parenting classes, taking my children to school,

15   going to their therapist, doing AA meetings.  It all just

16   came down on me and I relapsed.  But this time I think

17   things are going to be different.  I have two children that

18   need me and actually come visit me.  They even wish that

19   their mother was in there and I was out, which shocked me,

20   and it just -- that made me realize how much those children

21   really do need me.  And hopefully, when I do get out, this

22   never happen again.

23       I understand that if I come into these courtrooms

24   again -- any courtroom, I'm looking at a lot of trouble, and

25   I do understand that.

1          I'm asking you, your Honor, to just give me a chance.

2     I will do whatever it takes just to be with my children and

3     my family.

4          My mother's getting old now.  She's very old.  She's on

5     dialysis.  I do a lot of work for them.  That's also a

6     burden on me, too, doing a whole lot of chores and stuff for

7     them.  I was working at five o'clock in the morning.  I

8     didn't get out until six o'clock, which is -- it was too

9     much for me, and I relapsed after 15 years.

10         That's what happened.

11         (Whereupon, the defendant breaks down.)

12             THE COURT:  Why don't we just take a minute.

13         (Pause in proceedings.)

14             THE COURT:  No case is easy, and this is a more

15     difficult case than most.

16         I think on the mitigating side, Mr. Sinsheimer has

17     pointed to all the right factors.  The age of the defendant

18     being significant, but most probably, however, is the de

19     minimis nature of the offense.  It is a very small drug

20     sale, and I am sensitive to the fact that if we were not

21     looking at the career criminal history category, we would be

22     talking about a sentence that would be well within the range

23     that Mr. Sinsheimer is recommending, if not, indeed, below

24     what the defendant has already served.

25         On the other hand, I am also sensitive to the fact that

PDF created with pdfFactory trial version www.pdffactory.com

1    this is one of those cases where it is not a statutory

2    scheme that is driving the criminal history categorization,

3    it's actually the number of convictions, which add up, even

4    though some of them show a consistent pattern of domestic

5    relationships and strains within that relationship and

6    abuses involving the same victim, as best as I can tell from

7    most of the convictions and the number of the offenses

8    reported that did not result in conviction, we still have 26

9    criminal history category points, which is twice what the

10    Sentencing Commission envisioned as the most serious record

11    that they could imagine.

12        So I cannot put aside the criminal history.

13        I am also sensitive to the fact that when we began this

14    case we were talking about a 188-month minimum sentence.

15    That then was reduced to 151 on the basis of the plea.  The

16    government further reduces the recommendation, I think for

17    very good reasons that Mr. Wortmann expressed, to 96 months.

18        I am willing to go a lit bit further.  I accept the

19    Sentencing Guidelines.  I can see reasons why, perhaps, they

20    overstate the appropriate sentence that ought to be imposed.

21    But, again, taking the prior record into account, I am

22    willing to adjust the Guideline range down to a Level 22 and

23    an 84-month sentence, which is the sentence that I will

24    impose.

25        Mr. Merritt is obviously a very good citizen in a

PDF created with pdfFactory trial version www.pdffactory.com

structured institutional setting.  He does fine.  It's being
put under the stress, I think, of a domestic situation.  I
understand children can be an enormous toll and enormous
pressure, and I'm sure at the heart, as best I can tell from
a cold record and description, that tension over the
upbringing of the children probably lies at much -- it does
not excuse it, but lies in an explanatory way at the heart
of a number of the domestic violence convictions.

I don't know.

Mr. Wortmann, you might see it differently, but that's
the way I thought I had read the record.

But while I realize it's a harsher sentence than the
crime itself would warrant, I think I have to take the
entire picture into account, and I think this is the
appropriate sentence to impose.

I will also impose the five years of supervised release
in the hopes that this, indeed, is the last best opportunity
that we have for Mr. Merritt to change his life.

Mr. Merritt, would you stand please.

This is, of course, subject to the reservation of
rights that the Court has acknowledged.

Mr. Merritt, pursuant to the Sentencing Reform Act,
and, more particularly, having considered the sentencing
factors enumerated at 18, United States Code,
Section 3553(a), it is the judgment of the Court that you be

1   committed to the custody of the Bureau of Prisons for a term

2   of 84 months.

3       It is my understanding that you will be credited for

4   time served since April 23, 2011, when, I believe, the

5   arrest on the related state charge resulted in custody.

6       The Court will make a judicial recommendation that you

7   participate in substance abuse treatment while in the

8   custody of the Bureau of Prisons.

9       Upon release from custody, you will placed on

10  supervised release for a term of five years.

11      Within 72 hours of release from custody, you must

12  report in person to the district to which you are released,

13  which will be the District of Massachusetts, with reasonable

14  certainty.

15      The Court will not impose a fine.  Obviously, you have

16  no capacity to pay a fine.

17      While on supervised release you will comply with the

18  following terms and conditions:  You will comply with the

19  standard conditions that have been adopted by the court.

20  These are described at United States Sentencing Guidelines,

21  Section 5D1.3(c).  They will be set forth in writing in the

22  Judgment.

23      You will not commit, of course, any federal, state or

24  local crime, nor will you illegally possess a controlled

25  substance.

1    You will refrain from any unlawful use of a controlled

2    substance.  You must submit to one drug test within 15 days

3    of release from custody and at least two periodic drug tests

4    thereafter, not to exceed 104 tests per year, as directed by

5    the Probation Office.

6    By law you are required to submit to the collection of

7    a DNA sample, again, as directed by the Probation Office.

8    The Court will impose the following special conditions:

9    You are prohibited from possessing a firearm, destructive

10   device, or other dangerous weapon.

11   You will participate in a program for substance abuse

12   counseling as directed by the United States Probation

13   Office, subject to the drug-testing conditions I previously

14   imposed.

15   You will be required to contribute to the cost of

16   services for such treatment based on your ability to pay or

17   the availability of a third-party payor.

18   You will not consume alcoholic beverages.

19   You will participate in a certified Batterers

20   Intervention Program with an anger management component,

21   again, as directed by the Probation Office, subject to the

22   potential requirement that you pay for the cost of such

23   services.

24   You will further participate in an educational service

25   program as directed by the Probation Office.  My hope is

PDF created with pdfFactory trial version www.pdffactory.com

1    that you will -- I believe you are still working on your

2    GED, but this is something that you will accomplish before

3    sentence has expired.  If not, I will make that a condition

4    of supervised release.

5         Finally, it is ordered that you pay to the United

6    States a special assessment of $100.  That will be due, by

7    operation of law, immediately.

8         You are entitled to take an appeal.  That may very well

9    depend on circumstances, as we learn them, regarding the

10   drug in question and the manner in which it was handled by

11   the State Laboratory, but I will instruct the Clerk to

12   advise you of the right of appeal.

13        THE CLERK:  Mr. Merritt, you have the right to file

14   a Notice of Appeal in this case.  If you do wish to file a

15   Notice of Appeal, you must file it within 14 days from the

16   date in which I enter the judgment.  If you cannot afford an

17   attorney to file the appeal on your behalf, you may request

18   me to do it, and I will file it in the Clerk's Office for

19   you.

20        THE COURT:  Mr. Merritt, this is not something I

21   would ever, I think, say to someone with a record as long as

22   yours, but, despite that record, I think you have a lot of

23   good in you.  I do think you really are devoted to your

24   children, and I think that you are important to their lives.

25        I think if you could just absorb some of the lessons

1    that --

2            THE DEFENDANT:  Part of it, I left out, is my wife

3    is disabled.

4            THE COURT:  I realize you've labored with a lot,

5    and in the right setting you do just fine.  You show a lot

6    of capacity for good.  It's just that drugs, I realize, have

7    been a serious disability in your life.

8        Anger, you know, is another one, and those two, when

9    fueled by, sometimes, alcohol as well, I mean, is what

10   really has put your life off the rail.

11       But this is not the longest sentence that could have

12   been imposed.  It's probably well under what would have been

13   imposed if we stayed where we began with this case, and I

14   think it does give you a chance to pull your life together.

15   I think you actually have the capacity to do it, and my hope

16   is that I won't see you again, at least in circumstances

17   like this.

18            THE DEFENDANT:  No.

19            THE COURT:  All right.

20       Thank you very much, counsel.

21       MR. SINSHEIMER:  Judge, may I raise one thing

22   quickly?

23       I'm concerned about the 14-day period while the

24   reservation of rights is also out there.  Is there any way

25   you can stay entry of the judgment just --

1          THE COURT:  I'm not sure that the entry of judgment

2     would affect anything.   My concern is if I don't enter

3     judgment, then he stays in state custody.

4          MR. SINSHEIMER:  I guess I should ask you also if

5     you could recommend he be as close to Massachusetts as

6     possible.

7          THE COURT:  I'm happy to do that, but my thought is

8     he is going to get a lot more benefit out of getting into a

9     treatment program --

10          MR. SINSHEIMER:  I agree.

11          THE COURT:  -- in a federal facility.

12          MR. SINSHEIMER:  Let me talk to Mr. Wortmann.  I'm

13     sorry for not thinking this through.

14          THE COURT:  Talk to him.  If there is something I'm

15     missing -- but what I would do is file a Protective Notice

16     of Appeal, which will then operate as soon as the Judgment

17     enters, to ensure that whatever rights are preserved, in

18     fact, remain preserved.

19       Okay.

20          MR. SINSHEIMER:  Thank you.

21          THE COURT:  All right.

22          THE CLERK:  All rise.

23       (Proceedings adjourned.)

24

25

# **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                March 7, 2012

_____
James P. Gibbons


JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com